With our argument next this morning, Case 13-14-12, the City and County of San Francisco v. Sheehan. Ms. Van Aken. Thank you, Mr. Chief Justice, and may it please the Court. Ms. Van Aken, before you go any further. Yes, Justice Scalia. Your petition for writ of certiorari, and it was a petition that had your name on it, said, On the reasons for granting the petition, this Court should resolve whether and how the Americans with Disabilities Act applies to arrests of armed and violent suspects who are disabled. The circuits are in conflict on this question. The question presented is recurring and important. And Title II of the ADA does not require accommodations for armed and violent suspects who are disabled. And that's the issue on which there is a circuit conflict. I now look at the table of contents of your petition. This argument is not made in the petition at all. You concede that Title II does apply even to the arrest of armed and dangerous suspects. You just say, in this case, modification to Sheehan's arrest would not have eliminated the significant risk she posed. There is a technical word for this. It's called bait and switch. We might well not have granted this petition had you not listed those reasons. Are we supposed to appoint somebody else to argue the point that you asked us to resolve in your petition for certiorari? With respect, Justice Scalia, San Francisco asked you to resolve the question of whether and how the ADA applies to the arrest of an armed and violent individual. And the answer to that question is it only applies where the significant threat that the individual poses has been eliminated. That's not what your petition said. Title II does not require accommodations for armed and violent suspects who are disabled, period, is what it says. And that is not the argument you make in your principle brief. Well, with respect, Justice Scalia, page 3 of our reply in support of certiorari, so still at the certiorari stage, says that the issue here is not a fact-intensive, reasonableness question, but instead it's whether an armed and violent individual's accommodation is required. And the answer to that is no, where the significant risk hasn't been eliminated. And our arguments at the certiorari stage certainly didn't turn on any claim that the ADA simply didn't. Sotomayor, I'm sorry. I looked at your papers below, and there was an argument as to whether the ADA applied at all to arrest. And nowhere do you raise the direct threat argument. Nowhere do you raise below the risk argument. It was a pure legal question, the one I thought we were going to answer. But on appeal, you're now using the words direct threat and risk. What are we supposed to do with this? Justice Sotomayor. We're supposed to change the nature of the case and perhaps reverse the Ninth Circuit on an argument that was never presented to it? I disagree, Your Honor. In the Ninth Circuit, San Francisco argued that the Ninth Circuit should adopt essentially the Fifth Circuit's rule, that where there are exigent circumstances that there is no requirement of accommodation. There was no argument that the ADA just has nothing to do with arrests. It's that in exigent arrests, like the Fifth Circuit said in Hindsay, then you don't – there's not a reasonable accommodation. No accommodation is reasonable. So in a sense, the ADA doesn't apply. But that's because of the exigency, as the Fifth Circuit said in Hindsay. And that was the conflict that we asked this Court to take the case to resolve. Before we get to the question that you have briefed and the question that the Solicitor General has briefed, there is another question that logically comes first. The statute, 42 U.S.C. 12132, says, No qualified individual with a disability shall, by reason of such disability, be subjected to discrimination by any such entity.  Yes. All right. So all we have there is discrimination. In the – is there any provision of the ADA that defines what is meant by discrimination in that context, not in the employment context, in that context? Congress's findings included a statement that discrimination includes a failure to make modifications in some circumstances. So we understand discrimination to include a failure to modify a government program. Excuse me. Where does that appear? Is that in the statute? It's 12101A5, Your Honor. Go ahead. 42 U.S.C. 12101A5. And that's a finding that discrimination includes not making an accommodation. And this Court has recognized that accommodation is part of the discrimination analysis in – in Olmstead, for instance. The Court said that Congress had a broad view of what discrimination meant. So let me return to my original point, which was that the case is about an entry. And police officers here sought to reenter a private home of a mentally ill woman who had just been – Well, before you get to that, I'm still not entirely satisfied with your answer about discrimination. I mean, we have to answer that question before we get to the arguments that you make and that the United States makes based on regulations that have been issued pursuant to the statute. If discrimination means what it means in ordinary parlance, which means treating people differently, then there would be no basis for those regulations. But nobody's briefed to this other issue, this threshold issue. Now, maybe you're right, but it hasn't been briefed. Well, I think discrimination includes the failure to make an accommodation where it's reasonable to do so. And I base that on the findings, as I mentioned. I base that on the regulations, which this Court said in Bragdon were entitled to deference, at least in the public accommodations context. Congress has recognized the reasonable accommodation duty in 42 U.S.C. 12206, which was subsequently enacted but mentions accommodations. And I also think it sort of follows from this context. The public service here is providing an injury-free arrest to the extent possible. Ms. Sheehan alleges that because of her disability, she wasn't able to take advantage of that public service to the extent other people would have been able to, but if we had provided her an accommodation, then she would have been able to. Now, we disagree with that factually, of course. Scalia, what is the public service that she could not do? An injury-free arrest. An arrest with a minimum of force. This is a public service. It's an activity, Justice Scalia. And it's an activity in the same sense that imprisoning someone is a public activity. And this Court said in Yeski that that indeed was. And so therefore, the ADA applied. The service at issue here, the activity at issue here is an arrest. But the circuits are unified. The Title II applies to arrests where they're divided. Let's call it an activity instead of a service. Yes, Justice Scalia. Let's call it an activity. Ginsburg. I have another preliminary question. The ADA does not apply to the individual officers, right? It applies to the entity. Yes. The scenario we presented are actions taken on the spot by two officers. What is the entity liability? Is this a vicarious liability? It's a respondeat superior type of liability. And I believe — it's certainly clear in the Ninth Circuit that the city is liable for the individual actions of its officers. The Monell doctrine only applies in the context of 42 U.S.C. 1983. So we accept for purposes here that where the officers are engaged in purposeful conduct on behalf of the entity, that the entity is liable for their liability. You're not making the argument that the entity would be liable for a pattern or practice of discrimination, but not what the officer on the beat does? No, I'm not making that argument. I'm not making that argument. And while we're talking about questions that are not, strictly speaking, in the case? Yes. Justice Kagan. What is your view of when you are liable for monetary damages? What's the standard on that? Right. So the ADA adopts the Rehabilitations Act remedies, which in turn adopts the Title VI remedies. So the city is liable in damages when it has engaged in intentional conduct, and the Ninth Circuit has expanded that to include deliberate indifference as well. And we think that here, if the conduct is purposeful, if the officers are intentionally making an arrest rather than refraining from making an arrest in the moment, then that conduct is purposeful for purposes of the remedy discussion. As long as they're intentionally making the arrest, you think that that meets the standard that? I think if they're on notice that there's – there might be an occasion to provide an accommodation, and they nonetheless make the arrest, then that meets the standard, I believe. I think that's the case in the Ninth Circuit. It's County of Duval v. Kitsap. It isn't that the institution must be purposeful, that it must be a policy of the institution. It's enough if the actor, the officer in question, acted purposefully. That was certainly the assumption of the Ninth Circuit here, Justice Scalia, that the entire liability issue in this case turns on whether the officers fail to make a reasonable accommodation. You don't challenge that, you think? Not in this case.  That's a rule in the Ninth Circuit. So you want us to assume that Title II applies, and then to say that in this case, however, because of this particular individual's behavior, there was an exemption from that normal application of Title II, and then we will decide in some future case whether it's true that Title II applies at all, right? I think Title II applies here. I think the question is so clear. You didn't say so in your petition. I respectfully disagree, Justice Scalia. We argued about how Title II applies to this case. And we argued that it did not apply – it did not create a duty here because of the degree of exigency. Title II of the ADA does not require accommodations for armed and violent suspects who are disabled. Correct. Now, that is not an argument. You're not arguing that here. You're saying in the circumstances of this case is all you're saying. I am arguing that. Is it enough that the individual was armed and dangerous? Is that alone enough? Yes. That is enough, because the individual was armed and dangerous. If there – if the individual had been disarmed, Title II would create an obligation. If the individual were not dangerous, Title II would create an obligation. Well, what about this case? Suppose that there is an armed and dangerous person who the officer knows is deaf. And the officer says, put your hands up or I'll shoot. Yes. And of course, the deaf person doesn't put his hands up and the officer shoots. Is that – I guess you're saying that the ADA has nothing to do with that case. I – if the person is dangerous in that moment and it is necessary to shoot to protect public safety, such as if the armed and violent deaf individual is raising a gun at the officer, then yes, the ADA – Well, that's not what you answered to me. You said if the individual is armed and dangerous – or actually should be armed and violent. That – now you're saying that is not enough. This individual was armed and violent, and you say it's not enough. It depends on the circumstances. Now, which do you want us to hold? Dangerous, Justice Scalia. Dangerous. If the individual presents significant threat, then no accommodation is required. Any accommodation is not – And there's a circuit conflict on that point, isn't there? I believe there is, Justice Scalia, because the Fifth Circuit in Hindsey said that any time there's exigent circumstances, you just don't look to the ADA. And what the Ninth Circuit has really done here, in our view, is given almost no weight to the exigency of the circumstances. And I think there's two ways the Court can resolve this case. One is to hold that the direct threat regulation applies to situations like this one, because the significant risk had not been eliminated here, and therefore there were – Where was that in your brief below? I'm sorry, which brief? Where was the brief below to the circuit court? Where did you use the words direct threat and parrot the statute? Yes. Because you're not parroting the statute. The statute says in determining whether an individual possesses a direct threat, a public entity must make an individualized assessment based on reasonable judgment that relies on current medical damage or on the best available objective evidence to ascertain the nature, duration, and severity of the risk, the probability that the potential injury will occur, and whether reasonable modifications will mitigate the risk. That is from the regulation, Justice Sotomayor. We did not cite this regulation to the Ninth Circuit. What we cited was Heinze and Heinze's analysis that in exigent circumstances you don't provide an accommodation. Now, we certainly think that at least where the exigent circumstances rise to the level that they did here, you don't provide an accommodation. And the reason for that is that the fundamental government activity here is protecting public safety. And so in that situation, in a situation like this one, time is of the essence. And so to delay, to delay an arrest as an accommodation where time is of the essence isn't a reasonable accommodation as a matter of law. And my argument to this Court is that because officers are making risk judgments to the public, they're not making a risk judgment. Sotomayor. Okay. All right. Contrary to what you're – I'll wait for your reply. I'm sorry, Justice Sotomayor. May I finish the question? Yes. There's no exit possible, and the police officers knew that. I'm sorry. Police officers knew that there was no way to escape from that apartment. They knew that the building was empty. Could you still defend their decision to go in, given that they could have waited and tried to talk her out? So if the building – if they knew the building was empty, unlike here, and if they knew there was no exit, unlike here, we still think there would be a question about whether she had other weapons in the room and could be preparing some kind of ambush or some kind of barricade. And that's something that the officers here testified they were concerned about. Page 198 and 199 of the Joint Appendix. So what they thought was necessary was to get that door open so that they could see what Ms. Sheehan was doing, so they could see if she were preparing an ambush or barricade. That's different than what they did, however. Well – They opened the door and they rushed in and pepper sprayed her. They weren't just opening the door to see if she had a gun or other instruments of danger. Justice Sotomayor, let's – let's assume my hypothetical. Doesn't – doesn't this require them, if it doesn't change the nature of their service protecting the public, to wait for their backup and to wait for the crisis intervention team? If they knew there was no danger from not opening the door, then yes, that could be a reasonable accommodation. They didn't know that here. So why isn't that jury fact? I'm sorry. They didn't know. Why isn't that a jury fact? It's not a jury fact because no reasonable jury could conclude that there was no significant danger here. I mean, the – the – what the officers were doing was preventing a danger that they had a reasonable basis to believe existed. They were doing that by opening a door. With respect, they didn't rush in. It was Ms. Sheehan who rushed out and crossed the threshold. What they did is open the door, prepared with pepper spray to use it, and then prepared to use their firearms if they needed to. And that's unfortunately what they needed to do. I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. Mr. Grisham, go ahead. Mr. Chief Justice, and may it please the Court, the ADA provides individuals with disabilities with important rights in their interactions with the police, including arrest. However, under the circumstances here, the Ninth Circuit applied the wrong standard when it sent to the jury both the ADA claim and the Fourth Amendment claim because it gave insufficient weight to the safety risks the officers faced when they confronted an individual who was mentally ill and armed and violent. I'd like to touch base first on the two preliminary – two of the preliminary questions that the Court has identified. First, it is clear that the ADA applies to arrests. The ADA applies broadly to any department or agency of a local government. That includes the police. And it implies to – broadly to activities, services, and programs, which also includes arrests. And there's no circuit conflict on that point? There's no circuit conflict since Yeski that it applies to arrests, Your Honor. So that's correct. And we think that that makes good sense. At the common law, it was clear that statutes normally did not apply to the police. For instance, even though the speeding law does not have an exemption for police vehicles, a policeman could speed. It was just assumed that normal criminal offenses did not apply to a policeman acting within the scope of his duties. But, Your Honor, the ADA, of course, is not a criminal statute and was an intent by Congress to apply quite broadly. As this Court recognized in Yeski, it applies to State prisons. The text of the statute doesn't have any exemption at all for police activity. No, I'm not talking about prisons. I'm just talking about enforcing the law. Your Honor, but I do think that, again, the statute has no exceptions, and this Court – the lower courts are in agreement, and it's consistent with the Justice Department guidance. And there's a good reason for that. It's along the lines of Justice Kagan's hypothetical. The things like providing an interpreter during the arrest of a deaf individual. As this Court, in the case that was before this Court about a decade ago in Gorman, providing transportation for a wheelchair-bound individual to the police station. For conducting sobriety tests, have a walk-the-line test for someone with physical disabilities. Those are the core kinds of things that the ADA is designed to get at. Ginsburg. And do you also agree, Ms. Van Aken, that there is vicarious liability? Because the ADA operates against entities, not individuals, not officers. So do you also accept that there's vicarious liability, rather than the enterprise, the entity would be liable if it had a pattern or practice? We do believe that, Justice Ginsburg, that there is the effectively responding out superior liability. Much of the time it will only be for injunctive relief, precisely because in the absence of an intentional harm, the damages would not be available. But, yes, we do believe that there is the equivalent of responding out superior liability. Of course, none of that has been briefed in this case. But if I could just touch on one more issue that hasn't been briefed in this case that the Court should not resolve, it's Justice Alito's question about reasonable accommodation. This Court said in Tennessee v. Lane, both in Justice Stevens's majority opinion and in Chief Justice Rehnquist's dissent, that reasonable accommodation was required by Title II of the ADA. That makes sense. Titles I, II, III, and the Rehab Act all require reasonable accommodation. Titles I and III do so expressly in 21-112 and Section 21-182. And Title II does it by reference. What Title II is broadly defines discrimination, and then in Section 12-201, Congress provided that the regulations and provisions the protections in Title II should be the same or no less than the protections in the Rehab Act, including the regulations of the Rehab Act. So I think it's clear that reasonable accommodation occurs. It is required by Title II. Alito, it does seem to me that the dynamics are different in the arrest context. Now, here, I guess the officers had reason to know that this individual had a disability. But what happens if police officers have to arrest somebody out on the street who seems to be behaving in an unusual fashion? How can they determine whether that person has a disability? It may be someone who's schizophrenic and isn't taking his or her medications. Or it might be somebody who does not have a mental illness but has taken some kind of controlled substance. How do they make those determinations on the spot when they're arresting somebody? So we do think the ADA applies when you know or believe that the person has a disability, including mental illness. So in some of the hypotheticals that Your Honor just poses, the ADA would not apply. But, of course, in this case, they did, as Your Honor says, they did know, and in fact, the whole purpose of the entry was to address a problem of mental illness. Alito, in the case I posited, there would be an issue about whether the officer should have known that this person who was behaving bizarrely had a mental illness? We don't believe that should have known is the standard in the ADA. So it is not a should have known standard with respect to the disability. With respect to how the Court should approach this, the question that we understand to be presented and whether it should adopt the Heinze approach, we have proposed for the Court that it apply the Barnett standard. The root of that standard is the recognition that in the mind run of cases like this, with an armed and violent individual, there will be great danger to the officers or to the public and short time. And so consistent with the Justice Department guidelines, which say the officer's priority is to stabilize the situation, and I think with the instincts of the courts of appeals, we think the right way to operationalize that instinct and map it onto this Court's precedent is through a Barnett standard, which is to recognize that it will very rarely be the case that an accommodation is needed. So when might one be needed under Barnett? Well, it goes, I think, to Justice Sotomayor's hypo with one tweak. It's our view that the rare occasions when accommodation would be needed involve something like when it's contained and visible. So a threat that you knew there was no opportunity for escape and you could see the individual, perhaps if there was a security camera in Ms. Sheehan's room, or another example, if you had a mentally ill individual with a knife cornered in an alley, so there was no possibility of escape and the officers could retreat, we think those might be the rare situations that a reasonable accommodation would be needed. The reason for that is a reasonable accommodation is not reasonable, a reasonable modification is not needed in our view, when it presents significant safety risks to the officer or the public. That would be a reasonable accommodation. Scalia, what about saying it is never reasonable to accommodate somebody who is armed and violent? So, Your Honor, that is the Fifth Circuit. That seems to me a fairly sensible statement. It is never reasonable to accommodate somebody who is armed and violent, period. So, Your Honor, we – Which is what some courts have held. The Fifth Circuit, I believe, is the only court to have held that. We don't think that that's the right standard, although we think their instinct there is a lot closer than what the Ninth Circuit has done. We don't think it's right for two – one legal reason and one sort of practical reason. The legal reason is this Court has avoided generally in the context of reasonableness the sort of bright-line rules that the Fifth Circuit has articulated. So that's the first reason. With respect to the practical consequences, I think it does get to the – to the – my response to Justice Sotomayor. Scalia, I don't accept that. That's not a bright-line rule. I think if you say it doesn't apply at all. Scalia, it doesn't apply in one particular circumstance where the person is armed and violent. Your Honor, we think that a sort of one notch back from that is actually the right approach, that it captures the idea that Your Honor is articulating and that drove the Fifth Circuit, but does it without the absolute rule, which is, I think, how many of the other circuits, other than the Ninth Circuit, are applying it. They recognize that exigency is very, very important, but there will be times when the exigency is sort of in an unstable equilibrium where the officers may have an obligation to back off. And it's precisely the case that Justice Sotomayor doesn't have to back off. Ginsburg. And you're asking for remand. You say most of the time officers can go ahead, but there may be times when not. What is there in the fact picture here that would warrant a remand? Remand to determine what? So, Your Honor, we do think a remand is appropriate, but we will say we're not we haven't seen anything in the record that would create that special circumstances. But in fairness to plaintiffs, because it is a different standard than the one that they faced below and they prevailed below, we think they should have a chance to go  Mr. Krishnagoran, if I can just get your understanding, what are the special circumstances that we're reserving here? Like, what is the reason for not adopting Justice the Fifth Circuit rule? Because I think there will be times when the exigency is controlled. Tell me what those times are. The paradigmatic case is when it is visible, when the suspect is visible and contained. So in other words, you can be assured that there's no additional risk from waiting and that you can be assured that there's no danger to the public. So, for example, had there been a clear door into Ms. Sheehan's room so they could see what she was doing, if she were sort of huddled in the corner, that might be a situation in which a reasonable modification was appropriate, even though the situation was not over-contained in that sense. Had she made a break for the window, had she made a move for another weapon, they could have done something. Well, but I suppose suicide is always a concern in a case like that, right? So, Your Honor, there is a risk of danger to self, and the officers are allowed to take that into account. We think that in a situation in which you can see her, that that would be a situation in which there were an argument for a reasonable modification. But we recognize that harm to self is something that the officers can take into account. Kennedy, I think the standard you just proposed gives no guidance at all to an officer faced with a violent person. Your Honor, may I answer? Sure. Your Honor, I do think it gives guidance in this sense. It says that absent situation in which you have – in which you can have some confidence that there's no risk to the public, you don't have to worry about a reasonable  Thank you, Your Honor. Thank you, counsel. Mr. Feldman. Mr. Chief Justice, and may it please the Court, the principal dispute in this case is a factual one, not a legal dispute. It's a factual dispute. Exactly. I don't know why we took the case. And I agree entirely with that comment, Justice Scalia, and that's why in our briefing we commented that perhaps this is an appropriate instance where the Court would dismiss as improvidently granted. The Hainsey discussion is very different than what's being proposed here. Hainsey got it wrong. What Hainsey said was that any time there's a confrontation that's out in the open, we just won't apply the ADA. But one of the powers of the ADA and one of the strengths of it is the regulatory framework is so comprehensive. And so we have the direct threat exception, the direct threat defense, Section 139 of the ADA regs, and it addresses all of the issues that are before this Court. The first and the primary consideration is was there or wasn't there a substantial risk to the public? And critically, it doesn't talk about risk to the individual. That's not within the ADA regulations. We're just talking about is there a risk to the public. And that's the disputed issue in this case. That's the issue that the Ninth Circuit set down. But there's another part to Section 139, and that's whether this – if there is a significant risk, if you can mitigate that risk with reasonable accommodations. And that's what Lou Ryder talks about in his report, is the various ways that we mitigate a risk when we're dealing with somebody who is mentally disabled. But let's go back to the risk, because, Justice Sotomayor, I think you hit the nail on the head. There was no public risk here. And the reason for that is because she was in her room and she had made clear she wanted to be left alone. She didn't chase after these officers. She closed the door. The officers had climbed up two flights of stairs to get to her front door. But the actual dispute was that Hodge, the social worker, claims he told them that this was a second-floor apartment and there was no way to leave and that the building had been evacuated. Exactly. So there's a factual dispute between what they say and the witnesses. Right. And the only time that we get beyond the record, I guess, is all of the arguments you've heard from Ms. Van Aken about, well, she might have had a gun, she might have had a hostage. She might have wanted to commit suicide, which is a reason – I mean, the officers did not go in there to shoot her. They used the pepper spray first. Why isn't that a sufficient justification? Two reasons, Your Honor. First of all, the reply brief makes very clear that when they went in the second time, it wasn't to help her. It was to apprehend her. And the second is that – Well, I'm not sure I understand that distinction. If you think she's going to harm herself, apprehending her prevents that. Shooting and killing her is not an efficacious way to prevent – I understand the point. And it's a clever point to make, except, as I said earlier, they used pepper spray the first time. And it was only when the pepper spray was ineffective that they had a necessity of taking armed action. Right. To get back to your question, the regulations that have been adopted in the ADA, the Department of Justice made a determination that danger to self was not a consideration under the direct threat defense to the ADA. That was a decision that the Department of Justice made. So that determination is not relevant here, but that, too, was hotly disputed. Remember that Hodge, when he filled out the form, he checked gravely disabled. He checked danger to others. He did not check danger to self. And what he testified to was that he did not give these officers any reason to believe that she was a danger to herself. Gravely disabled – Well, I understand the factual dispute in this case, but is your position that based on the justice regulations that danger to self is never a justification for approaching and trying to apprehend and subdue somebody in this situation? Under the ADA, that's clear. And the reason for that is the ADA contemplates providing reasonable accommodations as a way of avoiding discrimination. It would be inconsistent with the ADA if officers were to, as in this case, pepper spray, take people into custody as a way of preventing them from doing harm to themselves. I don't know why you wouldn't think the pepper spray, instead of the weapons in the first instance, wasn't a reasonable accommodation. If they had gone in with pepper spray, it might be a very different case. But they went in with pepper spray with their guns unholstered. But just to make clear, you say danger to the self. It's not a reason for apprehending the person? Not under the – it's not a reason – let me be clear. It is not a reason for failing to accommodate under the ADA? Or at least trying to. Correct. She had called for backup and she had called for the CIT, correct? Right. Danger to self may present issues under the Fourth Amendment, but that's not our case. Why should that be? I can't imagine why that should be. I mean, if you have a person that you know is mentally unstable and they're about to kill themselves, you have to back off and say, well, you know, this is not something that requires accommodation. And that's the determination that the Department of Justice made. I don't care. It doesn't make sense. I can't tell you, Your Honor, that it does or doesn't make sense. I can only tell you that that's the law under the ADA. And everybody, all the parties here have relied on Section 139 because it's what governs this issue, and it doesn't ask the police officers whether or not somebody is a harm to themselves. But this case is about danger to the police officers. This is a case where the social worker says she threatened to kill me. Yeah, and I think that's a very good point. I don't think this Court has to reach out and address what might or might not be the law in a situation involving somebody who might be a threat or a harm to themselves. Mr. Phillip, do you agree with the Solicitor General's standard here, and you just disagree on the facts, or do you disagree with the Solicitor General's standard? No, we disagree very strenuously with any notion that a special circumstances test should apply here. Looking at the U.S. Airways case, the Court adopted that test for very good reasons, and it was because in that case there was a direct conflict between the proposed accommodation and the employer's seniority rules. So in that circumstance, the Court added a burden to the plaintiff. That is in our case. In our case, we have symmetry between the proposed accommodation on the one hand and the way that San Francisco trains its officers and also universally accepted methods for dealing with mentally disabled individuals. So we're not in a situation where we need to adopt a special circumstances test. And as was noted earlier, I don't know what it means and I don't know how a police officer can possibly figure that out. What I said earlier about the direct threat exception and how powerful it is and how useful it is, that's what's in the regulation. And that's language that police officers understand because they're doing that already in the Fourth Amendment. Is there a direct threat here? Can it be mitigated through reasonable accommodations? Police officers aren't trained, and I don't know that they ever would be, to figure out what a special circumstance is. So we have a regulation. It's been adopted through notice and comment rulemaking. It's expressed in language that police officers can understand. It's been applied by the lower courts. This just isn't a case in which we should be adopting a special circumstances test, particularly since it wasn't addressed below. The Ninth Circuit didn't address any special circumstance test. And from what I know, no court in this country has ever decided whether to adopt that special circumstance test. So I think that what I thought that the government said, if somebody is armed and dangerous, the presumption is no modifications are required. Under Hainsey, if a person is armed and dangerous, then the ADA doesn't apply. That's a different issue that, as Justice Scalia has mentioned, hasn't been raised here. The argument that the government is making, as I understand it, is that if somebody is armed and dangerous, then there is a presumption that the direct threat exception is satisfied. And that's the only way to see that argument and have it make sense in the regulatory  Sotomayor, I have a hard time actually understanding if there's much of a difference between the reg and the government's special circumstance. Because the ADA, as a matter of course, doesn't say you have to change your procedures unless a reasonable accommodation can reduce the risk or can eliminate the risk. So what's the difference between that and special circumstance? The government is putting their thumb on the scale. That's the difference. There, I agree with you. Any time we start creating tests, I think it complicates things when you just go by the language. Right. The issue always for the jury is could they have eliminated this risk? And I agree with that. That is the issue in this case. That's what the reg says. Right. Right. But it should not be necessary for a plaintiff in an ADA case to also have to show that there were special circumstances. All the plaintiff needs to show is what the reasonable accommodations would be to prevent discrimination, and that the burden then shifts to the defendant to make the showing of direct threat if that's the defense that the defendant wants to assert. And throwing the special circumstances test in the middle of that, it violates and undermines the regulatory framework. Kagan. But I think the idea of the government's test, Mr. Feldman, is this is an extraordinary circumstance in which the government is facing somebody who has a weapon, somebody who may be violent at any time, and that we shouldn't turn every case into an inquiry about was this the absolute best thing that the police could have done. And that there's a lot of uncertainty in these situations, and some reason to give the police officers who have to deal with them the benefit of the doubt. Well, if you see it that way, Your Honor, then I think we're back to where we started and the point that Justice Sotomayor was making. There wasn't a threat here. So if we're going to have a special circumstances test. Kagan. Okay. But then that's, again, just the question of does this meet the special circumstances or does it not meet the special circumstances? I guess what I was trying to sort of figure out was the reason why you object to the government's test in the first instance. I think the best way to put it is that they have put their thumb on the scale. And it's a scale that has been carefully balanced in the regulations and the statute, and there isn't any reason for this Court to start changing what the regulatory framework is. It's not an issue that the lower courts have had an opportunity to develop. We don't know what circumstances it might or might apply in. It may be very well an issue that the Petitioners here can raise in the district court on summary judgment and an issue that this Court can decide at a later date. But the issue before the Court today is really just this fact issue that I started with, which is was there a direct threat here. And all of these cases are not directly threated, and all of these cases are not directly threatened. Roberts, if you were giving the two-sentence guidance in the education course to the police about what to do in a situation where they confront somebody who is mentally unstable, what would you tell them to do? If the direct threat defense is not satisfied, then you must accommodate that individual's disability. Well, that doesn't give – I mean, that throws a lot of legal terms at them. I mean, in terms of their actual on-the-ground guidance, can you do better than saying you must accommodate the disability? Well, they're trained in accommodation techniques, so I don't think that's really the issue. There's no dispute that the way to interact with mentally disabled individuals is through communication and time. Police officers know that, and they're trained that way. I think the difficulty that the Solicitor General and the Petitioners are identifying is that these are difficult circumstances and potentially dangerous. But that's what the direct threat defense governs. And to put English onto the direct threat defense, the police officers have to be asking themselves, as I think they already do under Graham v. Conner, is there an immediate threat to the public, and is that a threat that we can eliminate somehow? And if it can be eliminated by, for example, here, leaving the door closed, bringing in a negotiator, giving she and time to de-escalate, that entire risk that the officers here confronted was avoidable. And one of the things that Section 139 asks is what is the likelihood of the threat and what is the extent of the threat? Because whatever the risks of de-escalation here, the course that these officers picked led to the certainty of a violent confrontation with a mentally ill and agitated woman who is standing behind this door with a knife. And they knew that when they went in with their pepper spray. It was reasonably foreseeable that when they went in with their pepper spray and they had been set, it was reasonably foreseeable that they would need to shoot her. If that's the defendant's position. Scalia, I would have thought it was foreseeable that the pepper spray would disable her. If she wasn't. Isn't that what pepper spray is supposed to do? It is. And the Ninth Circuit. Was this defective pepper spray? What was the matter here? The Ninth Circuit has been quite good about explaining that nonlethal force does not work in the intended way when we're dealing with mentally disabled individuals. If I get shot with pepper spray, I'm on the ground dropping whatever knives I have. But when mentally ill individuals get shot with pepper spray, they don't always process it the same way. Sometimes they see that as a threat and sometimes they act irrationally. What would you say to officers who encounter a person on the street about determining whether the person has a disability? I think that's a difficult issue that isn't presented here. But police officers are trained to recognize disabilities. And the learning materials that Lou Ryder discusses in his report include how to identify somebody who is of diminished capacity or mentally disabled. But, again, that's not our case. These officers knew that she was disabled because they weren't called to this scene to arrest her. They were called to the scene to hold her. I understand it's not this case, but our decision would have implications in other contexts. So you would tell the officers, well, you have to determine whether this person is substantially limited in a major life activity, and if so, that person has a disability. What would you tell them? I would say that if you know or can reasonably determine that an individual is suffering from a mental disability, then the ADA reasonable accommodation requirements apply. Is being high on drugs a mental disability? I think it would depend on why somebody is high on drugs. They may have a high level of drug addiction. But he's high on drugs because he took drugs. Well, if it was a choice to take drugs and it was unrelated to a mental disability, then I think it would not be a mental disability. Why? Mr. Gershengorn said that the ADA was only triggered when the officer knew there was a disability. Do you disagree with that from your answer, Justice Alito? I agree with Ms. Van Aken that it's either new or should have known. And presumably there's no way to tell if there's somebody you come upon on the street who's exhibiting signs of being on drugs, whether that is because of prescription medication or illicit drugs. I think that's right. And but they eat, but they have to be treated differently. They do. I'm sorry, why? Well, if the danger is present, right, all right, why do they have to be treated differently? One would assume that if someone's dangerous and violent and there's no way to modify dealing with them, it doesn't matter whether they're disabled or not or what the cause is or not. The issue is don't resort to violence automatically if there's a way to mitigate the risk. Isn't that the answer? Now, whether you'll be liable for potential damages or an injunction or anything else, that depends on whether you knew the person was disabled. That's a different issue altogether. I agree with what you've said. The difference is whether there's liability under the ADA. That turns on whether the officer knew or should have known that the individual was disabled. The Fourth Amendment issues, you're absolutely right. When an officer confronts somebody who is of diminished capacity for whatever reason, the officer has to use reasonable force. And in a totality of the circumstances test, the diminished capacity is one of those circumstances. And it's not just for the connection. If you know about it. Right. But if you don't, and whatever the cause is, if the person's violent and there's no way to mitigate the risk, it doesn't matter whether they're disabled or not. Correct, because of Section 139. And, again, that's the strength of Section 139, is it tells the police officers exactly what they need to know. So we have a very robust regulatory framework, and it comes back down to this very simple issue of whether there was a risk. And things like guns, there was no evidence of any guns. Things like hostages, there was no evidence of any hostages. Officers were able to look into her apartment. They didn't see hostages. Hodge was in her apartment. He didn't see a hostage. He told them that the apartment building was empty. In terms of a risk of flight, they knew that they were on the second floor. Hodge had said to them that they needed a ladder to get in. Ginsburg's also said it was probably a fire escape. He was wrong about that, but he did say that. He didn't say that to them at the time. He said that in his deposition. And what he said was he doesn't know whether there is or isn't a fire escape. So all these officers knew at the time is that they were in a second floor building, the second floor, and Hodge had said to them very specifically, you need a ladder to get in. That was the evidence. That's the best available objective evidence that was available to these officers. And under this Court's Fourth Amendment jurisprudence, that's what we look at, objective evidence. Under the ADA, again, Section 139 uses that phrase, best available objective evidence. Kagan. And, Mr. Feldman, I guess I'm still trying to figure out exactly who's advocating for what legal standard and how those standards are connected with each other. But if you're using this direct threat regulation, do you understand you and the city to be advocating for the same legal standard? I think so. I think what differentiates the city on the one hand and us on the other is not what testifies, but whether it's satisfied here. Because you're both looking to the regulation as the test. Right. And the city says it's satisfied, you say it's not. Right. And the interesting thing is they're supporting amici cite the same regulation. Are supporting amici cite the same regulation. That is the regulation that governs whether there is or isn't a defense to a failure to accommodate. So the only party who is not saying that that's the standard is the Solicitor General, whose regulation it is. Well, the Solicitor General does have a footnote in their brief that says that even after the special circumstances analysis is conducted, the direct threat analysis might also be applicable. And I don't quite understand how that is the case, but as I said, I don't think that this is the right case for this Court to be thinking about whether a special circumstances test makes sense. It just hasn't had an opportunity to be vetted below. But what we're left with is pretty wide agreement that the direct threat defense governs these issues. And so if the Court doesn't have any more questions about that, I'll briefly address qualified immunity. The issue on qualified immunity is also a narrow one. It's not whether there was a Fourth Amendment violation, but whether the actions here violated clearly established law. And in the Ninth Circuit, we have two cases that involve substantially similar facts. And they're both cited by the Ninth Circuit in its decision below. One was Alexander and the other was Dioro. Alexander is a particularly interesting case because the defendant there was the city and county of San Francisco. So if they were aware of any case, you would think that would be one of them. The plaintiff in Alexander was mentally ill. The officers arrived at his house to execute an administrative warrant. And rather than allow them to do it, the plaintiff there threatened to shoot anyone who entered his house. And it's the exact same circumstances we have here. The situation was contained. There was no need to immediately enter, and the officers made the decision to go in, in circumstances that led to a violent outcome. And the Ninth Circuit held that the officers there were not entitled to qualified immunity as a matter of law because the extent of the threat was unknown and disputed. So it raised a jury question. Dioro is the other case that the Ninth Circuit cited. Dioro stands for the proposition that where an officer knows that an individual is mentally disabled, that's something that has to be considered in determining what force is appropriate under the Fourth Amendment. And we have very clear testimony from the officers here that at least when Reynolds made the decision to force their way back into Sheehan's apartment, they didn't consider Sheehan's disability. I thought in Dioro, the plaintiff was unarmed, had not attacked or touched anyone, had generally obeyed instructions. What the Court said is that he was unarmed in the sense that he didn't have a knife or a gun. What he had, though, was lighter's fluid. And so he had a dangerous instrumentality, and the issue is the same. The police officers forced a violent confrontation when there wasn't a need to do so. It's very hard when you have such a fact-intensive inquiry, and I think that was part of your submission, to say that the law was clearly established as to how they should function in a particular circumstance, which I think is important when you're talking about making the officers personally liable. Yeah, although this Court has looked at whether the facts of a previous case are substantially similar, sometimes it's described as being fundamentally similar, the facts don't have to be the same. Substantial similarity doesn't require exact similarity, but the facts of Alexander in particular are very, very close to the facts in our case. So whether it's fact-specific or not, we've got to think. Only facts in the same jurisdiction or of cases in the same jurisdiction are relevant?  Well, I mean, suppose this officer knows that in some jurisdictions, or at least in the Fifth Circuit, boy, you know, if this person's armed and violent, I don't have to accommodate at all. This Court has done that. You know, you could say that the point was not clear. I mean, how can you say that it was clear under at least under Supreme Court law? Well, the Supreme Court's decision in Wilson v. Lane and Hope v. Peltzer both look at whether there's precedent in the controlling circuit. These are officers who are in San Francisco within the jurisdiction of the Ninth Circuit. And unless and until this Court takes a case and reverses something that the Ninth Circuit has said, I think they're duty-bound to comply with Ninth Circuit precedent. On the qualified immunity issue, could we consider the question whether there was a Fourth Amendment violation at all? Assuming the city of – assuming that counsel for the officers raised that argument? Well, yes, absolutely. They did not raise it in their Petitioner's brief or the reply brief. They focused instead on the second prong of the qualified immunity analysis. But certainly this Court has the discretion to reach the Fourth Amendment principles instead. But do you think they waived that argument? I think there's an argument that they did. But, again, it's an issue that I think the Court has discretion to do what's appropriate. But I think it would be unusual for the Court to address it. And I think the Solicitor General makes this point, too, that to address an issue that hasn't been adequately briefed. If I could just conclude, I think the Court knows this. This is a case with enormous policy implications. One of our amici, and we've got several, and one of our amici counts among its members is a family that called the police to get help with their mentally disabled son. And the police showed up, and they, I'm sure, intended to help that individual, but instead they hurt it. And we see this in the news day after day, week after week, where the police arrive to help somebody and they wind up hurting them. And, Your Honors, it's only when officers and public entities are held accountable for actions like those that occurred here that we can expect to see a change in that pattern. So we ask that this Court affirm the Ninth Circuit. Thank you. Roberts. Thank you, counsel. Ms. Van Aken, you have three minutes remaining. Van Aken. I'd like to make two points in my very brief time. The first is that I think the Court took this case because there's a division in the circuits about the weight that they give to exigency and safety concerns in dangerous arrests like this one. I don't think there could be any question that in the Fifth Circuit, in the Fourth Circuit, where exigency has a lot of weight in the reasonableness analysis, that this case would have come out differently. And I think that's the fundamental legal difference between the circuits and between the parties. What I heard Mr. Feldman say, this is my second point and it goes to the reasonableness of an accommodation. I heard him say that it would only be reasonable to accommodate her if they could  And with respect, I agree with the Solicitor General. He's incorrect that the risk was eliminated. Mr. Feldman is incorrect that the risk is eliminated because Ms. Sheehan, whether or not she was fully contained, whether or not they had been told by Mr. Hodge that there was no other exit, she certainly was not visible. And behind her closed door, she could have been gathering her other knives, preparing an ambush. She had a cluttered room full of household items. Maybe there was a cup of bleach. She could throw in the face of the officers. The point is that the officers knew that they meant — she meant them harm. They knew that she did not intend to go peacefully to the hospital. And they knew that at some point, someone was going to have to go back in that room and deal with the situation. And so delay behind a closed door could have been allowing her time to calm down, but the officers had no way to know that. The final point I want to make is that — Sotomayor — the point of the treatment, though, to try to give it a chance. I mean, what your adversary has said is we can't assume, unless we want a society in which the mentally ill are automatically killed, there's 350 people a year estimated who are shot by police officers and killed who have mental illness. And this is not to minimize. There's 100 police officers who are killed, almost half of them from ambushes, and the other 50, I'm not sure what the circumstances were, but not ambush circumstances. The point is, isn't the ADA, and the House report makes this very clear, intended to ensure that police officers try mitigation in these situations before they jump to violence? Not where it increases safety risks to the officers. The nature of the activity at the point they were deciding whether to go in or not was to resolve a safety risk. So any accommodation that increases a safety risk isn't reasonable as a matter of law. Thank you. Thank you, counsel. Case is submitted.